IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE WORTH COLLECTION, LTD.,<br>Debtor | Chapter 7<br><br>Case No. 20-10337 (BLS) |
| DOUGLAS T. TABACHNIK, in his capacity as the Chapter 7 Trustee of the bankruptcy estate of The Worth Collection, Ltd.,<br><br>Plaintiff,<br>v.<br><br>(SEE EXHIBIT A HERETO),<br><br>Defendants. | Adv. Pro. No. 23- (See Ex. A hereto) (BLS) |

**MEMORANDUM OPINION**[1]

Before the Court is the Chapter 7 Trustee's Motion for Leave to Amend Complaints (the "Motion to Amend") in adversary proceedings he commenced against more than 100 individuals who received pre-petition transfers from the Debtor.[2] The original complaints, which were all mostly identical, asserted claims to avoid and recover alleged preferential and fraudulent prepetition transfers made by the Debtor to individuals known as the "Stylists," who were independent contractors that worked part-time to market and sell high-end women's apparel for the Debtor. A number of the Stylists, represented by three different law firms, filed motions to dismiss the original complaints for failure to state a

[1] This Court has jurisdiction to decide the Motion pursuant to 28 U.S.C. § 157 and § 1334(b). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(F) and (H).

[2] The adversary case numbers and names of the individual defendants who filed objections to the Chapter 7 Trustee's Motion for Leave to Amend are listed on Exhibit A hereto.

claim under Federal Rule of Civil Procedure 12(b)(6). After oral argument, the Court granted the motions to dismiss on the grounds that the complaints' allegations were broad, conclusory, and vague, and that they failed to contain sufficient facts to support plausible claims.[3]

In the Motion to Amend, the Trustee asserts that the proposed amended complaints (the "Amended Complaints")[4] correct the flaws in the original complaints. However, for the reasons set forth below, the Trustee's Motion to Amend will be denied.

Background

This Chapter 7 case has an unusual procedural history. The case was commenced by the filing of an involuntary petition on February 14, 2020 against The Worth Collection, Ltd. (the "Debtor"). The record indicates that the petitioning creditors were inventory suppliers or service providers to the Debtor's retail clothing sales business. The docket indicates that there were no fewer than 15 stipulations extending the time for the putative Debtor to answer or otherwise respond to the involuntary petition. On October 23, 2020, over eight months after the filing of the involuntary petition, the putative Debtor filed an answer.[5] Another five months passed before the entry of an order for relief on March 24, 2021 (the "Relief Date").[6]

Immediately following the order for relief, David Carickoff was appointed from the standing Chapter 7 Trustee Panel to serve as the Chapter 7 Trustee.[7] Two months later, the United States Trustee filed a report of disputed election relating to the proposed

[3] *See* Tr. 8/17/2023, Main Case D.I. 414.
[4] The proposed amended complaints are attached as Exhibits B and C to the Trustee's Motion to Amend.
[5] Main Case D.I. 40.
[6] Main Case D.I. 53.
[7] Main Case D.I. 54.

election of a different trustee by creditors in this case.[8] The dispute was resolved by the Court via the entry of an order dated June 29, 2021 appointing Douglas Tabachnik as the Chapter 7 Trustee.[9]

In August 2021, the Debtor's former counsel provided the Trustee with draft schedules and statements that had been prepared by the Debtor sometime during the gap period between the involuntary filing and the order for relief.[10] On October 1, 2021, the Trustee filed a motion asking this Court to compel a former officer or director of the Debtor to sign the Debtor's schedules and statements of financial affairs.[11] Former counsel for the Debtor responded to the Motion, advising the Court that the Debtor was no longer operating and that there did not appear to be any party or individual who could or would sign and verify the schedules and statements under penalty of perjury.[12] The Court denied the Trustee's motion.[13] It is undisputed that no verified schedules or statements have been filed in this case, and the Trustee has represented to the Court that he lacks sufficient information to attest to the accuracy and truthfulness of the Debtor's books and records and the draft schedules that he received.

The Trustee has filed numerous complaints in this case seeking to unwind a series of leveraged buy-out transactions undertaken by the Debtor in September 2016 (the "2016 LBO") that the Trustee contends ultimately led to the Debtor's financial ruin. In the Amended Complaints, the Chapter 7 Trustee alleges that the 2016 LBO Transaction resulted in over $25 million of loans secured by liens in the Debtor's assets.[14] The Trustee claims that, subsequent to the closing of the 2016 LBO Transaction, the Debtor did not

---

[8] Main Case D.I. 74.
[9] Main Case D.I. 87.
[10] *Id.*
[11] Main Case D.I. 103.
[12] Main Case D.I. 108.
[13] Main Case D.I. 110.
[14] Amended Compl. ¶ 32.

generate enough funds to service the 2016 LBO obligations while fulfilling the Debtor's other financial obligations and that the Debtor needed to borrow additional money in June 2019 from MidCap Financial Trust.[15] The Trustee further alleges that by December 2019, Midcap (through MCA Financial Group) determined to wind-down and liquidate the Debtor.[16] All of this is relevant to the claims against the Stylists because the Chapter 7 Trustee claims that MCA Financial Group and others directed a scheme to build up and sell inventory through the Stylists at a steep discount to maximize cash on hand, all the while intending to stiff the vendors who provided that inventory.[17]

In March 2023, the Trustee filed the original complaints against the individual Stylist defendants. As noted above, the original complaints were identical in form and substance, except that each complaint attached its own Exhibit A that identified the dates and amounts of the payments made to the individual Stylist against whom the Trustee seeks to recover.

Approximately 95 of the Stylist defendants filed motions to dismiss the original complaints under Federal Rule of Civil Procedure 12(b)(6), arguing that the Trustee's complaints contained cookie-cutter allegations that were too vague to adequately state plausible causes of action to avoid the payments as preferential or fraudulent transfers. As noted above, on August 17, 2023 the Court granted the motions to dismiss the original complaints.

The Chapter 7 Trustee filed the Motion to Amend. Three law firms, representing 100 Stylists combined, have filed objections to the Motion to Amend. At a status conference, the parties agreed that oral argument was not necessary and asked the Court to decide the Motion to Amend on the papers.

---

[15] Amended Compl. ¶ 33, ¶ 39.
[16] Amended Compl. ¶ 41.
[17] Amended Compl. ¶¶ 58-67.

## Standard

Federal Rule of Civil Procedure 15(a), made applicable to this proceeding by Fed. R. Bankr. P. 7015, provides that a court should freely give leave to amend a pleading "when justice so requires."[18] Courts may deny leave to amend upon finding (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failures to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party by virtue of allowing the amendment; and (5) futility.[19] The decision to grant or deny a motion for leave to amend is within the sound discretion of the court.[20]

## Discussion

The Defendants argue that the Court should deny the Trustee's Motion to Amend on the grounds of undue delay, futility, and undue prejudice to the Defendants. The Trustee disagrees, claiming that Defendants' arguments are more suited for a summary judgment motion and the parties should be permitted to proceed to discovery in these adversary proceedings.

### (1) Futility

"Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted."[21] "The standard for assessing futility is the same standard of legal sufficiency as applies under Federal Rule of Civil Procedure 12(b)(6)."[22]

---

[18] Fed.R.Civ.P. 15(a)(2). *Tilton v. MBIA Inc. (In re Zohar III, Corp.)*, 639 B.R. 73, 116 (Bankr. D. Del. 2022), *aff'd* 620 F. Supp. 3d 147 (D. Del. 2022).

[19] *Zohar*, 639 B.R. at 116 (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

[20] *Zohar*, 639 B.R. at 116; *Winer Family Trust v. Queen*, 503 F.3d 319, 331 (3d Cir. 2007).

[21] *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010) (quoting *In re Merck & Co. Sec., Derivative, & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007) (internal punctuation omitted) (overruled on other grounds as recognized in *In re Cognizant Tech. Sol. Corp. Derivative Litig.*, 101 F.4th 250 (3d Cir. 2024)).

[22] *Id.* (quoting *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (internal punctuation omitted)).

(a) *Preference Claims*

The Defendants argue that the Amended Complaints do not add any new substantive factual allegations to describe the alleged antecedent debt and, therefore, allowing amendment would be futile because the Amended Complaints could not withstand a renewed motion to dismiss under Rule 12(b)(6). The Trustee responds that the Amended Complaints now contain sufficient factual allegations to provide each individual Defendant with adequate notice of the transfers that the Trustee claims are subject to avoidance under Bankruptcy Code § 547(b).

The original complaints generally described that the Defendants, through agreements or other trade relationships with the Debtor, sold merchandise for the Debtor in return for commissions, sales incentives, free merchandise and/or reduced cost merchandise. The Amended Complaints add allegations about the preferential transfers in paragraphs 78-85, but those paragraphs mainly restate the same broad and vague statements about antecedent debt as the original complaints. For example, new paragraph 81 states "The Transfers to the Defendant during the Preference Period were made on account of antecedent debt - - namely, based on the agreement and trade relationship between the Debtor and the Defendant, of the commissions for sales procured by the Defendant or, in certain situations, of the commissions for sales procured by others who were in some manner affiliated with the Defendant." The new language simply reformulates that broad language of the original complaint. When granting the motions to dismiss the original complaints, the Court observed that "[t]he Trustee's allegations regarding antecedent debt boil down to: we know you had a relationship with the Debtor and we know you received payments."[23] The amended allegations similarly are too broad and too vague to satisfy the pleading requirement for identifying antecedent debt. The

[23] Tr. 8/18/2023 at 12:21-13:1.

Trustee has scant documents from the Debtor and argues that he should be permitted to proceed to discovery, but for other reasons stated *infra*, the Court finds that discovery would be burdensome and unduly prejudicial to the individual Stylists.

This Court previously determined that the Complaint's allegations regarding antecedent debt were insufficient, and the Complaints were dismissed under Rule 12(b)(6). Because the Amended Complaints fail to resolve the defect, the Court finds that allowing the Amended Complaints to go forward would be futile. The Motion to Amend the preferential claims will be denied.

(b) *Constructive Fraudulent Transfer Claims*

The Court dismissed the constructive fraudulent transfer claims in the August 17, 2023 ruling after determining that the original complaints failed to adequately allege insolvency at the time of the Transfers. As with the preference claims, the Stylists again argue that the proposed Amended Complaints fail to correct this defect. The Stylists assert that the new allegations in paragraphs 34-37 of the Amended Complaints discuss the Debtor's financial condition from 2015-2017 but fail to provide any underlying facts about insolvency at the time of the challenged transfers (that is, the period leading up to the involuntary petition on February 14, 2020).

The Trustee insists that the Amended Complaints sufficiently allege that the Debtor was balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due at the time the Transfers were made to the Stylists. The Trustee claims the Amended Complaints specifically allege that, subsequent to the LBO closing, the Debtor did not generate enough funds to service its financial obligations, the Debtor's financial condition never improved but instead further deteriorated, the Debtor continued to amass operating losses after the LBO, and the Debtor remained insolvent from September 2016

through the Relief Date – and was, therefore, insolvent when it made the transfers to the Stylists.[24]

The Trustee argues that the allegations in the Amended Complaints are entitled to the presumption of truth and further relies on *Zohar III Corp.*, in which the court determined that, "[i]nsolvency is a fact-intensive inquiry and precise calculations are not needed at this [motion to dismiss] stage."[25] The *Zohar* court further noted that "[d]iscovery will yield more answers on this topic" and denied the defendant's request to dismiss claims for failure to plead insolvency.[26] However, the *Zohar* court found that the complaint supported the insolvency allegations by including detailed facts such as descriptions of missed interest payments, defaults on repayment obligations, and detailed allegations of manipulated overcollateralization tests "to hide the failing financial performance, creditworthiness and health of the [companies]" during the relevant timeframes.[27]

While the Court agrees that precise calculations are not required at this stage, the allegations must contain more that allegations of net losses in 2015-2016 (as of the 2016 LBO Transaction closing), coupled with conclusory statements that the Debtor's financial picture never improved through the Relief Date. The Amended Complaints do not sufficiently correct the vague, conclusory allegations about insolvency at the time of the Transfers in the original complaint and, therefore, the Motion to Amend the constructive fraud claim will be denied as futile.

---

[24] *See* Amended Compl, ¶¶ 34-40.

[25] *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC (In re Zohar III, Corp.)*, 631 B.R. 133, 173 (Bankr. D. Del. 2021).

[26] *Id.* at 173-74.

[27] *Id.*

(c) *Actual Fraudulent Transfer Claims*

Fraud-based claims implicate a heightened standard of pleading under Fed.R.Civ.P. 9(b), which provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.[28]

"To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."[29] The requirements of Rule 9(b), however, may be relaxed and interpreted liberally where a trustee, or trust formed for the benefit of creditors, is asserting fraud claims because "the trustee often does not have all the facts that the debtor in possession would have about the conduct of parties pre-petition."[30] With this standard in mind, the Court reviews the Amended Complaints allegations of actual fraud.

In the August 17, 2023 ruling, the Court determined that the original complaints failed to allege fraud with particularity and dismissed the claims to avoid actual fraudulent transfers. The Trustee asserts that the Amended Complaints adequately allege badges of fraud and specify particular facts to support the claims to avoid actual fraudulent transfers.[31] Generally, the Trustee argues that the Amended Complaints describe that the Debtor, while insolvent, increased the frequency and amount of the transfers to the Stylists as part of a secret liquidation scheme in which the Debtor intended to defraud its vendors by convincing vendors to ship inventory to the Debtor, without intending to pay them.

[28] Fed.R.Civ.P. 9(b), made applicable hereto by Fed.R.Bankr.P. 7009.

[29] *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018) (*quoting Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).

[30] *Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus., Inc.)*, 2015 WL 3827003, *4 (Bankr. D. Del. June 19, 2015) (citing *Off'l Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 544 (Bankr. D. Del. 2009)).

[31] The Amended Complaints assert claims to avoid actual fraudulent transfers under Bankruptcy Code § 548(a)(1)(A) and § 544(b), with 6 Del. C. §1304(a)(1).

Instead, the Trustee alleges that the Debtor planned to use the inventory proceeds to pay certain secured lenders, winddown expenses (including professional fees), and to funnel increased commissions to Stylists. The Stylists respond that the Amended Complaints fail to include any facts (new or old) to support the conclusory allegations of a secret liquidation scheme to defraud vendors.

"Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent," often in the form of badges of fraud.[32] The badges of fraud that courts often rely on include, but are not limited to: (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction.[33] "The presence or absence of any single badge of fraud is not conclusive."[34] "Although the presence of a single factor, i.e., badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provide conclusive evidence of an actual intent to defraud."[35]

The Trustee has added paragraphs 65-68 and 90-100 to the Amended Complaints to bolster the actual fraudulent transfer claims. Paragraph 99, in particular, lists specific badges of fraud that, the Trustee asserts, show that the transfers to the Stylists were "designed to hinder, delay, or defraud one of more of the Debtor's vendors." The Stylists argue that the additional paragraphs fail to correct the deficient allegations, which still

---

[32] *Off'l Comm. of Unsecured Creditors of Fedders North America v. Goldman Sachs Credit Partners, L.P. (In re Fedders North America, Inc.),* 405 B.R. 527, 544 (Bankr. D. Del. 2009). Fed.R.Civ.P. 9(b), made applicable hereto by Fed.R.Bankr.P. 7009, provides: "In alleging fraud or mistake, a party must state the particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

[33] *Id.* (citing *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551 (D. Del. 2005)).

[34] *Id.* (citing *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006)).

[35] *Id.*

lack a particularized factual basis. The Court's review of the Amended Complaints' allegations, together with the badges of fraud described above, reveals as follows:

(i) The relationship between the debtor and the transferee: Paragraph 99 contains a long statement asserting a relationship between the Stylists and the Debtor's equity sponsor by alleging that one Stylist ("who represented that she was the Debtor's biggest salesperson, that she had a team acting as sales agents for the Debtor under her …, that she had relationships with numerous other of the Debtor's sales agents, and that the Debtor's other sales agents directly or indirectly either listened to or took direction from her")[36] was married to a bankruptcy attorney, and together they were counseling the Stylists. Further, the paragraph alleges that this Stylist and her husband stated that they were close friends with lead counsel for the Debtor's equity sponsor. The Trustee then asserts that it would be "unreasonable" that an experienced bankruptcy attorney would conclude that the Debtor was paying the vendors, while knowing that the Stylists were getting "enhanced commissions" in a secret going-out-of-business sale and knowing the Debtor's secured lender was seizing proceeds of that sale. After the bankruptcy filing, the bankruptcy attorney stated that "he knew where the bodies were buried" with regard to the Debtor and its estate, subsequently "backpedaling" when he learned that the Debtor's equity sponsor (who was represented by a close friend of the attorney) was a target of litigation by the Trustee.

It is difficult to follow the Trustee's reasoning that this attenuated connection establishes a plausible basis for demonstrating that the Stylists had an insider relationship with the Debtor or that the Debtor had a fraudulent scheme to deceive vendors.

(ii) Consideration for the conveyance: The Trustee claims the Debtor did not receive adequate consideration in return for the increased commissions paid to the Stylists,

[36] Amended Compl. ¶ 99.

citing to paragraphs 86-88 of the Amended Complaints, which broadly state (without factual basis) a lack of reasonably equivalent value was given by the Stylists for the commissions. At most, the Amended Complaints describe a robust incentive program to encourage the Stylists to aggressively pursue sales. The statements are inadequate to support this badge of fraud.

(iii) Insolvency or indebtedness of the debtors: The Trustee asserts the transfers were made while the Debtor was insolvent, citing paragraph 93 which asserts that the commissions were paid with "increased frequency and in unusually large amounts" but without any factual basis to allege insolvency or financial hardship of the Debtor.[37] While the Amended Complaints describe losses that occurred following the 2016 LBO Transaction, no factual basis is asserted to show that the Debtor was insolvent at the time of the disputed transfers to the Stylists.

(iv) How much of the debtor's estate was transferred: The Trustee asserts that "[t]he inventory was the Debtor's principal asset, so after the inventory was liquidated, the Debtor lacked significant physical assets."[38] The Debtor's business was selling clothing through the Stylists. Holding a sale - - even a liquidation sale - - of inventory through the Stylists, without more, is not sufficient to establish a fraudulent scheme to strip the Debtor of its assets.

(v) Reservation of benefits, control, or dominion by the debtor over the property transferred: The Trustee contends that the Stylists took a large share of the Debtor's assets, but there is no allegation that the Debtor remained in control of transferred assets. These funds were payments to the Stylists on account of the sales that they generated.

[37] *See also* conclusory statements of insolvency in Amended Compl. ¶¶ 69 and 90; and discussion under Constructively Fraudulent Transfer Claims, *supra*.

[38] Amended Compl. ¶ 99.

(vi) Secrecy or concealment of the transaction: The Trustee, citing paragraphs 94-96, claims that the Debtor (along with other parties) disguised its "going out of business sale" as its annual "Spring Sale," and informed many parties (*e.g.*, Stylists and customers) of the final liquidation of assets, while hiding that fact from the vendors "so that the Debtor's vendors would continue to supply goods and services to the Debtor despite the Debtor knowing such vendors could not, and would not, be paid for such goods and services."[39] The Trustee argues that the inference from these allegations is that everyone but the vendors were told about the liquidation sales. However, the Debtor's emails spreading news of the liquidation sale to over 100 Stylists and all of their customers leads to an inference that there was no deliberate concealment. Without more facts, the Debtor's omission alone does not support a finding of a fraudulent scheme.

The Trustee further contends that the Court's analysis should not be limited to the badges of fraud but should also consider other facts establishing fraudulent intent. "If the 'natural consequence' of a debtor's action is to hinder, delay or defraud creditors, a court may infer an intentional fraudulent conveyance."[40] The Trustee argues that fraud was the natural consequence of not telling the vendors that the Debtor was winding down its business and was holding a going-out-of-business sale, while paying increased commissions to the Stylists. Although the Amended Complaints describe a liquidation sale that included a robust incentive program to encourage the Stylists to aggressively pursue sales, but the allegations are too vague to jump to a conclusion of a fraudulent scheme against vendors.

The standard for assessing futility of the Amended Complaints is the same standard of legal sufficiency as applies under Federal Rule of Civil Procedure 12(b)(6). Assuming

---

[39] Amended Compl. ¶ 96.

[40] *Kirschner v. J.P. Morgan Chase Bank, N.A. (In re Millennium Lab Holdings II, LLC)*, 2019 WL 1005657, *3 (Bankr. D. Del. Feb. 28, 2019) (citing *In re Tribune Co.*, 464 B.R. 126, 162 (Bankr. D. Del. 2011)) (internal punctuation omitted).

that truth of the Trustee's averments that the Debtor failed to notify the vendors about the Debtor's winddown plans, without more facts, does not establish a plausible basis for an actual fraud claim.

(2) Undue prejudice

"Inquiries into prejudice require the court to focus on hardship to the defendants if the proposed amendment were to be permitted."[41] The Court considers the impact of additional discovery, cost, and preparation to defend against new facts and theories.[42]

The Stylist defendants contend that they will be highly prejudiced and will suffer hardship if the Motion to Amend is granted. They observe that years have passed between the applicable Preference Period and the filing of the original complaint. The Stylists argue that conducting discovery and preparing for trial after all this time will create an undue hardship for them. The Stylists assert that individual defendants, many of whom are unsophisticated parties who worked part-time for the Debtor, may face obstacles and great expense to retrieve records related to the defunct Debtor company that are needed to defend these claims.

The Trustee responds that he is not the cause of any delay here. He notes that the original complaints were filed within the applicable statute of limitations and the Amended Complaints were filed within 31 days after dismissal. The Trustee also asserts that the amendment will not cause undue prejudice to the individual defendants by creating additional costs for discovery and trial preparation because these proceedings are still in the earliest, pre-discovery stages.

---

[41] *Miller v. SWZ Fin. II, LLC (In re United Tax Grp., LLC)*, 2018 WL 1135496, *6 (Bankr. D. Del. Feb. 28, 2018) (citing *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)).

[42] *Id.*

While the Court agrees that the Trustee has not caused undue delay here,[43] it cannot ignore the prejudicial effect to the individual Stylists caused by the length of time between the allegedly preferential or fraudulent transfers and the filing of the original complaints and the Motion to Amend. Much of the delay in this case occurred due to the unusual gap between the filing of the involuntary petition and the entry of the order for relief. Much of the prejudice appears due to lack of the Debtor's verified business records. The unusual procedural history of this case and the lack of the Debtor's business records, neither of which is any fault of the individual Stylists, results in undue prejudice to the Stylist defendants.

## Conclusion

For the foregoing reasons, the Court concludes that the Motion to Amend will be denied. An appropriate Order will be entered.

FOR THE COURT:

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

Dated: September 24, 2024

[43] "Undue delay" is a separate consideration from "undue prejudice." "The question of undue delay, as well as the question of bad faith, requires that [the court] focus on the plaintiffs' motives for not amending their complaint to assert this claim earlier; the issue of prejudice requires that we focus on the effect on the defendants." *Adams*, 739 F.2d at 868.